UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
TERRENCE MOORE, KEVIN KELLY, JOHN           :
COFFEY, RONALD RICHARDSON, JOHN             :
BRUNETTI, KEVIN O'BRIEN, and MICHAEL        :
CAHILL as Trustees of the METAL             :
LATHERS LOCAL 46 PENSION FUND, METAL        :
LATHERS LOCAL 46 TRUST FUND, METAL          :
LATHERS LOCAL 46 ANNUITY FUND, METAL        :
LATHERS LOCAL 46 VACATION FUND,             :
METAL LATHERS LOCAL 46 APPRENTICESHIP:
FUND, METAL LATHERS LOCAL 46                :
SCHOLARSHIP FUND, and METAL LATHERS         :
LOCAL 46 DENTAL FUND; and STEPHEN           :
MCINNIS, MICHAEL CAVANAUGH, PAUL            :
CAPURSO, JOHN SHEEHY, PAUL PYZNER,          :
CHRISTOPHER WALLACE, DAVID MEBERG,          :
KEVIN O'CALLAGHAN, PAUL O'BRIEN,            :
JOHN DELOLLIS, JOSEPH KAMING, and           :
CATHERINE CONDON as Trustees of the         :
NEW YORK CITY DISTRICT COUNCIL OF           :
CARPENTERS PENSION FUND, NEW YORK           :
CITY DISTRICT COUNCIL OF CARPENTERS         :
WELFARE FUND, NEW YORK CITY DISTRICT        :
COUNCIL OF CARPENTERS APPRENTICESHIP        :
JOURNEYMEN RETRAINING, EDUCATIONAL          :
AND INDUSTRY, and NEW YORK CITY             :
DISTRICT COUNCIL OF CARPENTERS              :
ANNUITY FUND,                               :
                                            :
        PlaintiffS,                         :
                                            :          13 Civ. 4205 (JSR)
        -v-                                 :
                                            :          MEMORANDUM
RIVER AVENUE CONTRACTING CORP., RNC         :
INDUSTRIES LLC, EXTREME CONCRETE            :
CORP., RICHARD J. TONYES, SR., SONIA        :
TONYES, ROBERT DUGAN, and RICHARD           :
TONYES, JR.,                                :
                                            :
        Defendants.                         :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

        On January 10, 2013, plaintiffs in Metal Lathers Local 46

Pension Fund v. River Avenue Contracting Corp., several union

1

benefit funds established and maintained pursuant to collective-bargaining agreements, filed suit, alleging violations of the Labor-Management Relations Act ("LMRA"), the Employee Retirement Income Security Act ("ERISA"), and state common law. By "bottom-line" Order dated June 10, 2013 and Memorandum dated July 22, 2013, the Court dismissed all of plaintiffs' claims except those brought pursuant to the LMRA against River Avenue Contracting Corp. See Order, No. 13 Civ. 234, ECF No. 70 (S.D.N.Y. June 10, 2013). On June 18, 2013, in response to the dismissal, plaintiffs in Moore v. River Avenue Contracting Corp., No. 13 Civ. 4205, who were the trustees of the plaintiff funds in the Metal Lathers action, filed a separate action based on identical factual allegations and raising substantially identical claims. On July 15, 2013, plaintiffs in both actions moved pursuant to Rule 42(a) of the Federal Rules of Civil Procedure to consolidate the two cases for all purposes under the caption of this second action, which the Court granted. See Order of July 29, 2013, ECF No. 21.

In Moore, the Court also issued several "bottom-line" orders on various matters. Specifically, the Court denied the RNC Defendants' motion to disqualify plaintiffs' counsel, granted in part the RNC Defendants' motion to dismiss the seventh cause of action (common-law fraud under ERISA) as to individual defendants Richard Tonyes, Jr. and Robert Dugan, and otherwise denied the motions to dismiss.[1]

---

[1] The "RNC Defendants" are RNC Industries LLC ("RNC"), Richard J. Tonyes, Jr., and Robert Dugan. The "River Defendants," then

See Order of Sept. 25, 2013, ECF No. 47. In addition, following
discovery, defendants moved for summary judgment dismissing the
complaint while plaintiffs moved for summary judgment dismissing
most of the many affirmative defenses raised by defendants. The
Court denied defendants' motion and granted plaintiffs' motion,
except with respect to the sixth affirmative defense of the River
Defendants, concerning waiver and estoppel, which survives for trial
along with the affirmative defense of statute of limitations, which
was not a subject of plaintiffs' motion.[2] See Order of Feb. 3, 2014,
ECF No. 95. This Memorandum sets forth the reasons for these various
rulings.

The motion to disqualify was brought by the RNC Defendants on
two grounds, viz., that the original action was not properly
authorized and that there were fiduciary conflicts in representing
both the Metal Lathers' and Carpenters' funds. Disqualification is
disfavored because it interferes with a party's right to select
counsel, see Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir.
1983), and movants here did not come close to meeting their steep
burden. Despite the RNC Defendants' insistent but conclusory claim
that these suits were not authorized, they have produced no evidence

separately represented, are River Avenue Contracting Corp.
("River"), Extreme Concrete Corp. ("Extreme"), Richard J. Tonyes,
Sr., and Sonia Tonyes. The two groups of defendants answered the
complaint separately and moved to dismiss separately, but briefed
summary judgment jointly. See Stipulation and Order Substituting
Attorneys of Nov. 19, 2013, ECF No. 73.

[2] The corresponding seventh and eighth affirmative defenses of the
RNC Defendants likewise survive for trial; the rest are dismissed.

to substantiate that claim, even after the Court authorized ample

discovery on the issue, including depositions of the majority of the

funds' trustees. On the contrary, the plaintiff funds' trustees —

labor and management representatives alike — have unanimously

confirmed that they authorized the suit in accordance with the

funds' internal procedures. See January 6, 2014 Hr'g Tr., ECF No.

93, at 23:12-25:18. One is left with the distinct impression that

the RNC Defendants, in repeatedly raising this issue without factual

support, allowed strategic considerations to overcome good judgment.

     The contention that there was a fiduciary conflict in

representing both sets of funds is equally without merit.[3] The case

relied upon by the RNC Defendants, Moore v. Margiotta, 581 F. Supp.

649, 650 (E.D.N.Y. 1984), disqualified plaintiffs' counsel from

representing two different classes of plaintiffs that had two

"different theories of damages," which is not the case here, where

all plaintiffs allege an identical theory of damages. Indeed, the

RNC Defendants' argument appears to be that it violates the

fiduciary duty owed to clients to represent any two plaintiffs who

hope to make full recoveries against a defendant with a "finite

pot." See Mem. of Law in Supp. of Mot. to Disqualify Counsel at 16,

---

[3] The Carpenters' funds and their trustees settled their claims with
defendants after this motion was denied but before the issuance of
this Memorandum. See Stipulation of Dismissal of Dec. 12, 2013, ECF
No. 90. Accordingly, the Court does not here address those arguments
that were unique to the Carpenters' funds but are now moot.

ECF No. 27. But this is not remotely the law; indeed, if it were, no attorney could represent two plaintiffs against the same defendant.[4]

Regarding the Court's dismissal of the seventh cause of action for common-law fraud under ERISA against Dugan and Tonyes, Jr., dismissal was warranted because plaintiffs failed to allege reliance by plaintiffs on any false statement made by Dugan or Tonyes, Jr. Plaintiffs must plead such a claim with particularity. Fed. R. Civ. P. 9(b). The only false statement the Complaint alleges was made by these two individuals was an October 18, 2011 filing with the New York City Department of Buildings, Compl. ¶ 105, but plaintiffs do not allege that they ever saw this false filing, let alone that they relied on it. Accordingly, the Court dismissed the seventh cause of action as to those two individual defendants (though not as to the other defendants).

The Court otherwise denied the motions to dismiss. The other grounds for dismissal asserted by defendants — that the Complaint failed to allege underpayment and alter ego liability — were largely raised by defendants in the original Metal Lathers action. The Court rejected those arguments then and does so again now. See Memorandum at 4-5, 9-17, No. 13 Civ. 234, ECF No. 72 (S.D.N.Y. July 22, 2013) (discussing and finding sufficient the extensive allegations of overlapping management and work to support the alter ego theory, as

---

[4] Given the degree to which the RNC Defendants' motion lacks legal merit, plaintiffs moved for sanctions. While here, as in other respects, the Court is troubled by the cavalier approach to the law and facts taken by the RNC Defendants and their counsel, the Court, in its discretion, denies the motion.

well as underpayments on 25 job sites, and explaining that the alter ego doctrine applies not only with successor companies, but also with parallel companies).

The RNC Defendants did, however, raise two new grounds for dismissal beyond those previously rejected in Metal Lathers. First, they alleged that the Complaint fails to allege underpayment as to the Metal Lathers Local 46 Dental Fund or Metal Lathers Local 46 Trust Fund. See Compl. ¶ 94 (naming only Welfare, Pension, Apprenticeship, Vacation, Annuity, and Scholarship Funds). But the Complaint does list these two funds within the definition of "Local 46 Funds," Compl. ¶ 6, which phrase is used throughout the Complaint, and the two funds are named in the collective-bargaining agreement ("CBA"), which was attached to the Complaint and incorporated by reference, Compl. Ex. B at 15 (Article XII(8)). The Complaint thus adequately, if inartfully, alleges defendants' payment obligation and failure to meet it as to the Metal Lathers Local 46 Dental and Trust Funds.

The second ground raised by the RNC Defendants is that the seventh claim of action for common-law fraud under ERISA is legally insufficient as to the corporate defendant RNC Industries LLC, allegedly because the Court's June 10 Order in the Metal Lathers action limited such claims to the individual defendants. See Order at 2, No 13 Civ. 234, ECF No. 70 (S.D.N.Y. June 10, 2013) (citing Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo, 35 F.3d 29, 32 (2d Cir.

6

1994)). But neither that Order nor the Lollo case on which it
relied, said any such thing. Lollo concerns whether a corporate
official is sufficiently "controlling" to be personally liable for a
company's fraud under ERISA, but does not stand for the proposition
that a company cannot be held liable for fraud under ERISA (indeed,
the Lollo plaintiffs named only individuals). The underlying case on
which Lollo itself relies, Leddy v. Standard Drywall, Inc., 875 F.2d
383 (2d Cir. 1989), begins with the premise of a company's liability
and its holding extends that liability to a controlling corporate
official. Moreover, there is a well-developed federal common law
under the LMRA that alter egos may be held liable for fraud,
including ERISA fraud. See United Steelworkers of Am., AFL-CIO-CFC
v. Connors Steel Co., 855 F.2d 1499, 1506-07 (11th Cir. 1988).

    The parallel motion by the River Defendants also in part
repeats arguments rejected in the Metal Lathers action. But the
River Defendants also argue that the Complaint insufficiently pleads
facts showing that Sonia Tonyes may be liable under Lollo. However,
the Complaint does contain many particularized allegations that,
taken as true for these purposes, support a finding that Sonia
Tonyes is a controlling corporate official, e.g., that she is the
President of Extreme and registered it at a false address, Compl. ¶¶
10, 12; that she and River caused false filings to be made to the
various funds, specifically regarding the 25 work sites listed, id.
¶¶ 27, 28, 104, 109; and that she signed 22 checks made to "cash" as
part of a scheme to pay off-books wages to avoid detection, id. ¶¶

7

35-37, 108. Therefore, the seventh cause of action for common-law fraud under ERISA survives as to Sonia Tonyes, Richard J. Tonyes, Sr., RNC, and Extreme.

The River Defendants raised three additional arguments in their motion to dismiss that were not previously addressed by the July 22, 2013 Memorandum in Metal Lathers. First, they argue that plaintiffs are entitled to no contributions owed more than six years prior to the filing of this Complaint on June 18, 2013. That may turn out to be the case, because the New York statute of limitations for contract actions is six years, but plaintiffs correctly urge that equitable tolling may be available because of defendants' alleged fraud, an issue that is the subject of factual disputes that must be resolved at trial.[5]

Second, the River Defendants argue that there was an inadequate allegation of the "written agreement" containing the detailed basis of fund contributions as required by LMRA Section 302(c)(5)(B), codified at 29 U.S.C. § 186(c)(5)(B). In particular, the River Defendants argue that Tonyes, Sr. did not sign the Metal Lathers Local 46 CBA referenced in the Complaint, which instead is an agreement between Local 46 and the Association of Concrete Contractors of New York, Inc. ("Association"). But the Complaint not only alleges the existence of the written agreement, Compl. ¶¶ 15-18, it attaches the written agreement, Compl. Ex. B. Further, there

---

[5] The Court therefore need not reach at this stage plaintiffs' additional argument that the claims relate back to the Metal Lathers Complaint, which was filed on January 10, 2013.

is no requirement that the document be signed, only that it be in writing. See 29 U.S.C. § 186(c)(5)(B).

The River Defendants further contend that River, despite making payments according to this CBA for years, never in fact agreed to it. It is true that River's designation agreeing to be bound by the Association's agreement with Local 46 came on July 23, 2008, see Compl. Ex. A at 4, several weeks after the July 1, 2008 date of the Association and Local 46's agreement, which expires June 30, 2014. The designation, signed by Tonyes, Sr., says that River "DOES hereby designate, appoint, and authorize the ASSOCIATION OF CONCRETE CONTRACTORS OF NEW YORK, INC. as its sole and exclusive agent in the negotiation and execution of a Collective Bargaining Agreement with Metallic Lathers Union of New York Local No. 46 and to replace the present Collective Bargaining Agreement due to expire . . . ."[6] From this, the River Defendants urged that the designation bound River only for the future CBA, if any, that might begin on July 1, 2014,

---

[6] The designation contains an apparent typographical error. There are two choices with blanks for the employer to initial, the first of which reads, "DOES NOT designate, . . ." and the second of which reads, "DOES hereby designate, . . ." Compl. Ex. A at 3. Tonyes, Sr. initialed the second option. They are clearly meant to be the same, as an employer either is or is not designating the Association with the authority described. The language quoted above is from the first option, while the second option contains an error so that it reads, "as its sole and exclusive agent in the negotiation a Collective Bargaining Agreement," omitting the necessary phrase "and execution of" between "negotiation" and "a Collective Bargaining Agreement." Given the correct phrasing in the first option and the nonsensical result of the typographical error in the second, the Court finds the second option to encompass the same authorization as the first, except that the second does authorize the designation while the first does not.

9

rather than the one that began on July 1, 2008. However, this proposed interpretation is belied both by River's course of conduct and by the plain language of the designation, which binds River to the Association for "negotiation and execution of a [CBA] . . . and to replace the present" CBA (emphases added). In other words, the designation binds River to the existing CBA and in addition authorizes the Association to negotiate on River's behalf for the next CBA. Even if there were a basis to dispute River's obligations to Local 46 under the CBA, the written agreement is unquestionably adequately pleaded in the Complaint, as even "an expired collective bargaining agreement satisfies the written agreement requirement of § 302(c)(5)(B)." Cibao Meat Prods., Inc. v. NLRB, 547 F.3d 336, 341 (2d Cir. 2008).

Third, the River Defendants note that employees of Extreme and RNC, who were presumably members of Local 46, were barred from receiving benefits from the Local 46 Funds, which must benefit Local 46 members. The suit should therefore be dismissed, the River Defendants urged, to the extent it seeks payments for those employees, because such payments would violate LMRA Section 302(c)(5)(A), codified at 29 U.S.C. § 186(c)(5)(A) (benefit funds must be "for the benefit of employees, their families and dependents"). But this is not a correct statement of the law; if it were, there would be no alter ego liability for fund obligations. The Supreme Court has clearly stated that employers may be liable for contributions to such funds on behalf of employees who

10

nevertheless are ineligible to benefit because they perform diverted work for alter ego companies. See Walsh v. Schlecht, 429 U.S. 401, 404 (1977). Defendants' reliance on Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. Fairfield Cnty. Sprinkler Co., Inc., 243 F.3d 112, 118 (2d Cir. 2001) is therefore misplaced, as that case did not involve alter ego companies.[7]

The Court next turns to plaintiffs' motion for summary judgment seeking to dismiss many of the affirmative defenses raised by defendants in their Answers. The River Defendants raised 20 affirmative defenses and the RNC Defendants 15, many of them covering the same ground. See Answers, ECF Nos. 51, 55. The Court may dismiss affirmative defenses as legally insufficient under Federal Rule of Civil Procedure 8(c) and 12(c) or as factually insufficient under Federal Rule of Civil Procedure 56(c). See Estate of Hamilton v. City of New York, 627 F.3d 50, 57 (2d Cir. 2010); Laforo v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475-76 (2d Cir. 2009).

The primary problem with so many of the "affirmative defenses" of both sets of defendants is that they are not affirmative defenses at all. An affirmative defense is one that "will defeat the plaintiff's [] claim, even if all the allegations in the complaint are true. The defendant bears the burden of proving an affirmative defense." Black's Law Dictionary 482 (9th ed. 2009). At oral

---

[7] The Court has considered the other arguments raised by defendants' motions to dismiss and finds them to be without merit.

argument, the Court asked defendants' counsel whether defendants were hoping to relieve plaintiffs of the burden of proof and assume it themselves on elements of the main case like damages and liability. Defendants' counsel wisely declined, and identified for the Court those few affirmative defenses in the River Defendants' Answer for which defendants actually bore the burden as affirmative defenses numbers two (unclean hands), six (waiver and estoppel), seven (statute of limitations), and ten (illegality). Accordingly, the Court dismissed, effectively on consent, the remainder of the River Defendants' affirmative defenses and corresponding RNC Defendants' affirmative defenses. See January 6, 2014 Hr'g Tr., ECF No. 93, at 15:15-17, 16:7-9.

Also at oral argument, plaintiffs' counsel conceded that the River Defendants' sixth affirmative defense be permitted to remain in the case. See id. at 16:2. Moreover, plaintiffs had not moved to dismiss the seventh affirmative defense, see Notice of Mot. for Summ. J., ECF No. 68, so these two truly affirmative defenses survive for trial, as do the corresponding seventh and eighth affirmative defenses of the RNC Defendants' Answer.

Both sets of defendants' second affirmative defenses are unclean hands. Although not suffering from the same legal deficiency as the others — unclean hands is a classic affirmative defense for which defendants carry the burden — this affirmative defense suffers from the factual deficiency of having no supporting evidence sufficient to survive summary judgment. Defendants' proffered theory

12

of "unclean hands" is not that plaintiffs were complicit in the
fraud, or had committed some other unsavory act that would
disentitle them from seeking equitable relief. Rather, defendants
believe that, if they are correct that there is no written agreement
detailing the contribution obligation, then a demand for such
payments would be illegal (the River Defendants' tenth affirmative
defense), and such an illegal demand would render plaintiffs' hands
unclean.

However, as already discussed, there is a written agreement
attached to the Complaint that satisfies the requirement of LMRA
Section 302(c)(5)(B), and alter ego liability for such obligations
is well-established. See Ret. Plan of UNITE HERE Nat'l Ret. Fund v.
Kombassan Hldg. A.S., 629 F.3d 282, 289 (2d Cir. 2010). Moreover,
defendants Tonyes, Sr. and Sonia Tonyes both conceded in their
deposition testimony that River was bound by the CBA, see
Declaration of Susan Jennik, Ex. 2 at 97:7-98:9, Ex. 18 at 47:19-
48:4 (which the Court did not consider on the motion to dismiss but
will here for summary judgment). To the extent defendants urge that
their purported withdrawal from the Association relieved them of
their obligations, they are mistaken, as withdrawal from a
multiemployer association is ineffective until the expiration of the
contract. See James Luterbach Constr. Co., Inc., 315 N.L.R.B. 976,
979 (1994). And further, the CBA itself in Article XV says that
Association members are bound "and subject to its obligations until
the termination date," which is June 30, 2014. Finally, this theory

13

suffers from the same defect infecting so many of the other defenses mis-labeled as affirmative in that it seeks to rebut an element of the plaintiffs' case that they have to prove, namely the existence of a written agreement. Accordingly, the second and tenth affirmative defenses of the River Defendants, as well as the corresponding second, thirteenth, and fifteenth affirmative defenses of the RNC Defendants, were dismissed.

There is an additional affirmative defense raised by the RNC Defendants, their twelfth, which argues that the original Metal Lathers suit here was improperly commenced without authorization, which was one of the bases for the motion to disqualify counsel discussed earlier. Although defendants' counsel acknowledges that, despite ample additional discovery authorized by the Court, there is no evidence of any dissent from any fund trustee to the bringing of the original suit, the argument made at oral argument was that the board was improperly constituted. See January 6, 2014 Hr'g Tr., ECF No. 93, at 22:6-24:18. Despite the RNC Defendants' arguments about the composition of the board, which they may not even have standing to raise, the Court finds that the board was properly constituted. Even though the resignation of one management representative temporarily left four labor representatives to management's three, LMRA Section 302(c)(5) "requires a court to look beyond pure numerical equality of representatives to see if there is 'meaningful adherence' to the congressional command of equality." Mason Contractors Ass'n of Am. v. Int'l Council of Emp'rs of Bricklayers &

14

Allied Craftsmen, 853 F. Supp. 515, 524 (D.D.C. 1994). Here, such
adherence is obvious, and the authorization was unanimous in any
event. The RNC Defendants' twelfth affirmative defense was therefore
dismissed.

Finally, the Court turns to defendants' motion for summary
judgment, which the Court denied in its entirety. Defendants seek
summary judgment on five grounds, some of which have, in effect,
already been discussed in connection with the other motions
discussed above. First, defendants move for summary judgment on the
seventh cause of action as to Sonia Tonyes, Tonyes, Sr., RNC, and
Extreme on grounds already discussed. Second, defendants move for
summary judgment on the first, second, third, and fifth causes of
action on the already discussed grounds of statute of limitations,
lack of a written agreement, and the purported illegality of
obligating contributions for non-members' work. Third, defendants
move for summary judgment on the fifth cause of action on the ground
that plaintiffs did not send the notice required by Article XIX of
the CBA. Fourth, defendants move for summary judgment dismissing the
entire Complaint on the ground, again, that the nonunion employees
were not eligible for participation in the funds. Fifth and finally,
defendants move for summary judgment on the ground that they are not
alter egos and therefore not liable (which, as noted, is a genuine
factual dispute in this action).[8]

---

[8] Defendants' reply brief also argues for the first time that the
Agreement constituted an illegal closed-shop agreement, which, in

It was, of course, entirely appropriate for defendants to re-
raise these issues on summary judgment because the standard is
different from a motion to dismiss. Specifically, under Federal Rule
of Civil Procedure 56(a), a party requesting summary judgment must
demonstrate that there is "no genuine dispute as to any material
fact" and that she is "entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(a). In assessing whether such a dispute here
exists, however, the Court was not well served by defendants' motion
papers, which promised that the facts defendants put forward were
"undisputed except where indicated," see ECF No. 65 at 1, yet wholly
failed to acknowledge that virtually all of their purportedly
undisputed facts were in fact hotly disputed by plaintiffs through
admissible evidence.

As previously explained, the seventh cause of action for
common-law fraud under ERISA was adequately pleaded with
particularity in the Complaint as to Tonyes, Sr. and Sonia Tonyes.
The question now is whether plaintiffs have adduced competent
evidence of a disputed material fact that would preclude summary
judgment. Defendants concede that Tonyes, Sr. is a "controlling
corporate official" under Lollo, but argue that Sonia Tonyes is not.
While it is true that she is the President and sole shareholder of
Extreme, liability does not attach "solely by virtue of [her] role

---

addition to being legally incorrect, was improperly raised for the
first time in a reply brief and will not be considered by the Court.
See Reply Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 17,
ECF No. 86.

16

as officer, shareholder, or manager." Lollo, 148 F.3d at 195. But there is more here than her title. Sonia Tonyes was uniquely responsible for preparing River's weekly remittance reports to the funds and transmitting the amounts owed. See Declaration of Susan Jennik ("Jennik Decl."), ECF No. 78, Ex. 2 at 315:20-317:24; id. Ex. 12 at 225:18-22. She was also an authorized signatory on the accounts of River, Extreme, and RNC, with the authority to open accounts. Id. Ex. 4 at 63:16-21; id. Ex. 18 at 17:6-13.

Furthermore, what Sonia Tonyes did with her financial authority strongly implies that she was a controlling corporate official. For example, in December 2009, Sonia Tonyes wrote or cashed three RNC checks totaling over $1 million, including an RNC check to Extreme on December 22, 2009 for $395,424.10. Id. Ex. 18 at 133:23-136:23. She also admitted that at that time Extreme had no employees other than herself and she could not recall the purpose of the payment or what Extreme did with the money. Id. The total amount paid to Extreme by RNC from 2006 to March 13, 2013 was $611,062. Id. Ex. 61. RNC paid her $583,000 from January 1, 2006 through March 15, 2013, but neither could she recall the purpose of those payments. Id. Ex. 62. Finally, Sonia Tonyes participated with Tonyes, Sr. in the apparent sham of representing Extreme as distinct from River by renaming its address 11 Claremont instead of 9 Claremont (River's address), even though it was the very same building. Id. Ex. 18 at 85:2-86:20. In conclusion, plaintiffs have met their burden to

17

produce evidence from which a reasonable fact-finder could determine that Sonia Tonyes is a controlling corporate official.

As to both Sonia Tonyes and Tonyes, Sr., defendants contend that plaintiffs did not communicate with them directly and did not rely on the allegedly fraudulent remittance forms in determining River's delinquency. See Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 24, 29, ECF No. 63. But plaintiffs dispute these statements, noting that Sonia Tonyes prepared the weekly remittance reports, which were communicated directly to plaintiffs, and that plaintiffs reasonably relied on the data in the forms, if not the forms themselves, in calculating what River owed. See Pls.' Resp. to Defs.' 56.1 ¶¶ 24, 29, ECF No. 70. Plaintiffs also point to a series of statements from Tonyes, Sr. disclaiming involvement in Extreme that were allegedly misleading. Id. ¶ 37.Defendants' contention that this set of facts does not permit a finding of reliance is without merit.

Defendants also argue that plaintiffs' skepticism about the claim that Extreme, RNC, and River were wholly unrelated precludes reliance because when a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations but must make additional inquiry to determine their accuracy. See Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980); see also Grumman Allied Indus. V. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions

18

enjoy access to critical information but fail to take advantage of
that access, New York courts are particularly disinclined to
entertain claims of justifiable reliance."). But the principle of
these cases is inapposite here where Local 46 did not contract
directly with River but instead negotiated with the Association on
behalf of its members.

With respect to the seventh cause of action, defendants also
urge dismissal as against RNC because the Court previously dismissed
RNC's nominal owners, Dugan and Tonyes, Jr., and as against Extreme
for the same reasons they sought dismissal as against its nominal
President, Sonia Tonyes. However, fraudulent intent may be imputed
from a responsible individual to a company, and if plaintiffs' alter
ego theory prevails, it may be that the fraudulent intent of Tonyes,
Sr. or Sonia Tonyes is imputed to RNC or Extreme. Accordingly, the
Court declines to dismiss the seventh cause of action as against the
alleged alter ego companies.

Defendants also seek partial summary judgment on the first,
second, third, and fifth causes of action on grounds already
covered: statute of limitations, lack of a written document and
corresponding lack of subject-matter jurisdiction, and illegality of
payment for nonunion workers. As previously explained, the Court
declines to resolve the statute of limitations issue for now because
plaintiffs have a colorable argument for equitable tolling due to
defendants' alleged fraud, for which plaintiffs have produced facts
more than sufficient to survive summary judgment. Further, there is

strong evidence of a written document detailing the basis for the
contributions, certainly enough to survive summary judgment and
create subject-matter jurisdiction. Finally, there is no legal
prohibition whatsoever on making contributions to the funds on
behalf of nonunion employees who performed covered work wrongfully
diverted to alter ego companies.

Next, defendants move for summary judgment dismissing the fifth
cause of action on the ground that plaintiffs did not send the
requisite notice under Article XIX of the CBA. The relevant
provision states that "if the Union, by an officer in written
notice, notifies the subcontracting Employer or Employers that the
subcontractor is not complying, the Employer shall be responsible
for such non-compliance for the period beginning two (2) working
days after the receipt of such notice." Compl. Ex. B at 19.
Defendants urge that plaintiffs' failure to provide two days' notice
is fatal to their fifth cause of action. But this notice, by its
plain terms, is required only for alleged violations of the
prohibition on subcontracting. Plaintiffs do not allege in the
Complaint that River violated the CBA by subcontracting work to RNC
and Extreme; rather, plaintiffs' theory is that RNC and Extreme are
alter egos of River performing diverted work in violation of the
CBA's covered-work provision, not its subcontracting provision. This
argument is without merit.

Defendants' fourth ground asserted for summary judgment is a
paragraph-long recitation of their frequently made contention that

20

it is illegal under the LMRA to contribute to the funds on behalf of employees who are not union members. See Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 21-22, ECF No. 65. The Court finds it sufficient to note, yet again, that alter ego liability for such contributions is perfectly legal. See Walsh v. Schlecht, 429 U.S. 401, 404 (1977). This argument remains meritless.

Defendants' final ground for summary judgment asserts that River, Extreme, and RNC are not alter egos. Defendants reassert their legal argument that alter ego liability is available only in successor situations rather than parallel companies; but this is a position contrary to law and already rejected by this Court. See Memorandum at 17, Metal Lathers, No. 13 Civ. 234, ECF No. 72 (S.D.N.Y. July 22, 2013); see also Kombassan Hldg., 629 F.3d at 288.

Turning to the facts, defendants — in seemingly willful disregard of the record — argue that plaintiffs failed to produce evidence showing that the River, RNC, and Extreme are alter egos. Plaintiffs' factual case for their alter ego theory, however, is substantially more than sufficient to survive summary judgment. See generally Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 2-20 (exhaustively cataloguing facts supporting alter ego theory). Among many other things, plaintiffs have adduced competent evidence that, if credited, would show that: (1) Tonyes Family entities utterly failed to follow corporate formalities; (2) Tonyes, Sr. appears to own River, RNC, and Extreme; (3) River, RNC, and Extreme were operated and managed as a single entity; (4) River, RNC, and

21

Extreme did the same work for the same customers; (5) Tonyes, Sr. and Sonia Tonyes completely control the three companies; (6) all three companies share common employees and common labor relations that are controlled by Tonyes, Sr.; (7) the companies moved millions of dollars between themselves without any documented or recollected business purpose; and (8) an extraordinary amount of cash flowed between the companies and the Tonyes Family. Each of these contentions is supported by more than enough evidence to survive summary judgment, as described below.

First, plaintiffs have produced evidence demonstrating a lack of corporate formalities, including: (a) testimony by Tonyes, Sr., Sonia Tonyes, Tonyes, Jr., and Dugan that establishes that River and Extreme never issued stock, elected boards, or held any board or shareholder meetings, Jennik Decl. Ex. 2 at 19:20-20:14; (b) RNC, an LLC, had no operating agreement or other corporate document that identified its members, and there was no record of any member meetings, id. Ex. 4 at 46:9-22; (c) the Tonyes Family members variously claimed to have different roles at different companies, e.g., Sonia Tonyes claimed to be president of RACM and so did Tonyes Sr., id. Ex. 6, Ex. 2 at 21:8-10, and Tonyes, Sr. frequently represented himself as RNC's president on leases, change orders, and contracts, id. Exs. 8, 9, 10, 11; and (d) Dugan's name was frequently signed by other people (which may explain Tonyes Family employees taking the Fifth Amendment rather than answering who actually signed documents purportedly signed by Dugan), id. Ex. 12

22

at 188:19-191:18. Lack of corporate formalities is a hallmark of
alter ego status. See Trustees of Nat'l Elevator Indus. Pension,
Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 195 (3d Cir.
2003); NetJets Aviation, Inc. v. LHC Comms., LLC, 537 F.3d 168, 176-
77 (2d Cir. 2008).

Second, plaintiffs have produced evidence showing that Tonyes,
Sr. is the true owner, not just of River, but also of Extreme and
RNC, including: (a) although disclaiming ownership of Extreme,
Tonyes, Sr. was charged in an Information by the U.S. Attorney in
the E.D.N.Y. of "being the owner and operator of Extreme," to which
he pleaded guilty, Jennik Decl. Exs. 14, 15, 16; (b) Sonia Tonyes
testified of Extreme, "I was the owner on paper, but he was the
owner — he did the work," id. Ex. 18 at 14:16-15:4; (c) Tonyes,
Sr.'s criminal lawyer in a pre-sentencing letter wrote to the court
that his client "organized and founded, from the ground up, three
separate construction companies: River Avenue Contracting, RAC
Management Corporation and Extreme Concrete Corporation" and these
"were and continue to be Richard's heart and soul," id. Ex. 17. This
evidence could support a finding that the companies were alter egos.

Third, plaintiffs have produced evidence showing that the three
companies were operated as a single entity, including: (a) RAC
Management, Inc. ("RACM") was the Tonyes, Sr.-owned company that
managed River, RNC, and Extreme, id. Ex. 2 at 34:5-9; (b) RACM
personnel created a "Schedule of Companies" that listed the entities
managed by the same employees at 9 Claremont Ave., including River,

RNC, and Extreme, id. Ex. 19; (c) Sonia Tonyes testified that
Tonyes, Sr. negotiated the contracts for all River and Extreme jobs,
and that RACM did insurance, billing, and all office work for each
entity on the Schedule, id. Ex. 18 at 30:8-15, 45:11-25, 49:18-
50:12; (d) RACM also did the estimates, bids, negotiations, and
change orders for RNC, id. Ex. 2 at 29:25-33:14; (e) RACM assigned
job numbers sequentially without regard to which of River, RNC, or
Extreme worked the job, id. Ex. 18 at 43:25 to 45:10; (f) there were
no written agreements between any Tonyes Family entities outlining
payments and rates, id. Ex. 18 at 18:20-19:23, 21:8-15; (g) there
were no written leases for real property or equipment rental between
entities, id. Ex. 2 at 198:20-199:2, 226:14-227:3; (h) the three
companies had common accountants who kept common tax-liability
worksheets, id. Exs. 23, 24; (i) the companies utilized the same
suppliers, id. Exs. 26A-26K; (j) the companies deployed the same
equipment, id. Ex. 18; and (k) the companies hired the same
employees, id. Ex. 27.

Fourth, plaintiffs also produced evidence showing that River,
RNC, and Extreme did the same work for the same customers,
including: (a) River and RNC sent verbatim letters to potential
customers on 12/19/05 and 10/3/06 respectively, reading,
"[River/RNC] is an established firm with [over 28 years/several
years] of site work experience throughout the Tri-State area,
specializing in all phases of Concrete Construction and Utility
Excavation and Installation," id. Exs. 28A, 28B; (b) these letters

24

also stated that "the company is headed by a 'hands on' owner who personally oversees all field operations" and "we have an extensive array of equipment ample to take on any project you may require," id.; (c) these letters also featured an identical fax number, id.; (d) a customer testified that he did the same business with Extreme as he did with RNC, id. Ex. 29 at 28:18-25; and (e) River and RNC submitted letters to NYC DOB asserting they did the identical work on same buildings, viz., Tonyes, Sr. claimed on behalf of River, while Dugan claimed on behalf of RNC, "excavaction, rock removal, foundation, and superstructure work" at 3260 Henry Hudson Pkwy, "excavation, foundation, and superstructure work" at 540 W. 28th St., "foundation and concrete on metal deck work" at 3462 Third Ave., Bronx, and "foundation work" at St. Ann's Terrace in upper Manhattan, id. Exs. 30, 31.

Fifth, plaintiffs produced evidence tending to show that Tonyes, Sr. and Sonia Tonyes controlled the three entities, including: (a) Tonyes, Sr. and Joseph Spigonardo ran the bidding operation for new work for River, RNC, and Extreme, id. Ex. 3 at 28:6-7; (b) Spigonardo was the "general manager" of RNC yet also the 30(b)(6) witness produced for Extreme, id. Exs. 32, 33; (c) Tonyes, Sr. did the labor-hour estimates for every RNC job, id. Ex. 3 at 71:17-22; (d) Tonyes, Sr. signed many contracts but both he and Tonyes, Jr. implied that Tonyes, Jr. had signed them, and a certified handwriting expert confirms the discrepancy, id. Ex. 34; (e) various RNC contracts and change orders required the authority

25

of "Rich Tonyes," meaning Tonyes, Sr., even though defendants
pretended it meant Tonyes, Jr., who goes by "Ricky," id. Ex. 2 at
307:19, Ex. 35 at 124:4-10, Ex. 29 at 43:21-44:24; (f) Tonyes, Sr.
negotiated the RNC contracts with major customer Joy, id. Ex. 29 at
43:13-20, 42:21-48:3, 50:8-15; (g) Sonia Tonyes was authorized to
sign checks for RNC, and wrote RNC checks to other Tonyes Family
entities for $378,666.12 and $395,424.10 on two consecutive days in
December 2009 without knowing why, id. Ex. 18 at 132:9-133:20, id.
Ex. 38 at CITI000192, CITI000196; (h) Dugan, a nominal RNC owner,
was listed as "Field Superintendent" for RNC in NYC DOB filings, id.
Ex. 31 at MLCA 001268-69; (i) Dugan and Tonyes, Jr., the nominal RNC
owners, were listed as RNC foremen in employee accident reports, id.
Ex. 39; and (j) ten emails that demonstrate Tonyes, Sr.'s day-to-day
dominance of the businesses, including RNC and Extreme, the
ownership of which he disclaims, id. Exs. 41A-41J.

Sixth, plaintiffs produced evidence showing common labor
relations and employees among the three firms, including: (a) the
ten emails just cited show that Tonyes, Sr. took or approved various
labor actions at the three firms including wage rates, pay
increases, and vacation time, id.; (b) a former RNC employee
submitted a sworn statement that Tonyes, Sr. "is the boss at RNC,"
visits RNC worksites frequently, and was the man to talk to about a
wage hike, id. Ex. 43; (c) the three companies maintained a single,
integrated weekly payroll from 2006 through 2009, id. Ex. 44; (d) an
October 31, 2013 stipulation acknowledges these as regular books and

26

records of the three companies, id. Ex. 45; and (e) seven employees
were employed by all three companies at various points and another
two were shared by just River and RNC, see Pls.' Mem of Law in Opp'n
to Defs.' Mot. for Summ. J. at 16-17 (chart showing nine employees
and their overlapping employers).

Seventh, plaintiffs produced evidence showing that millions of
dollars flowed between the companies without documented or
recollected reasons, including: (a) RNC paid $20,160,831.95 to other
Tonyes Family entities between 2006 and 2013, Jennik Decl. Ex. 55 at
SP000126; (b) Sonia Tonyes did not know why $1.29 million was paid
over three months in 2011, id. Ex. 18 at 76:6-21; (c) One Tonyes
Family entity, Specialty Trucking, received from RNC $9,429,308
without a single payment documented as to business purpose, id. Ex.
35 at 28:18-23, 30:16-18; (d) although nominally owned by Tonyes,
Jr. and his sister Natalie Tonyes, Specialty Trucking is listed in
River's semiannual financial statements as "an entity related by
virtue of common ownership," id. Ex. 55 at RIV00116; (e) RNC paid
RACM $3,521,560 from 2006 to 2013 without documenting any reason
why, id. Ex. 4 at 295:25-296:4, Ex. 35 at 146:2-7; (f) RNC paid
Extreme $2,487,642 from 2006 to 2013, during most of which time
Sonia Tonyes was Extreme's only employee, id. Ex. 55 at SP000126,
Ex. 18 at 10:3-20; (g) from 2007 through 2009, the only
documentation for any of the RNC payments to Extreme is an annual,
one-line invoice for "Management Fees," id. Ex. 57; (h) RNC also
paid Sonia Tonyes $583,005 from 2006 to 2013, while she was also

billing RNC on behalf of Extreme for her same management services, id. Ex. 55 at SP000126; (i) RNC paid River Avenue Properties, another Tonyes Family enterprise, $2,221,063 from 2006 to 2013 without a lease or any other documentation, id.; (j) RNC paid 720 Blue Point Road Realty Corp., another Tonyes Family enterprise, $1.2 million from 2006 to 2013 without a documented or recollected basis, id. Ex. 18 at 41:22-42:24; (k) RNC paid River Avenue Concrete, another Tonyes Family enterprise, $939,320 from 2006 to 2013 without any documentation, id. Ex. 55 at SP000126; and (l) on March 15, 2006, Extreme gave its work on the Kalahari project at 40 W. 116th Street to RNC without any compensation whatsoever in return, id. Ex. 58, Ex. 4 at 295:25-296:4, Ex. 35 at 146:2-7.

Finally, plaintiffs adduced evidence showing that defendants routinely shifted large amounts of cash: (a) from 2006 to 2013, River paid out $1,410,200 in cash, RNC paid out $2,979,104 in cash, and Extreme paid out $2,954,354 in cash, id. Exs. 65A, 65B, 65C; (b) Dugan and two other River/RNC employees pleaded guilty on April 11, 2013 to federal tax fraud related to these cash payments; (c) the individual defendants all invoked the Fifth Amendment's protections in their depositions, id. Ex. 2 at 110, Ex. 18 at 90, Ex. 35 at 16, Ex. 4 at 96; and (d) rather than produce a 30(b)(6) witness about these cash movements, defendants agreed to stipulate, without waiving the Fifth Amendment, that the weekly payroll records maintained by the three companies show employees were paid "off-the-books," id. Ex. 45.

As this wealth of evidence indicates, defendants' motion for summary judgment on the ground that there is no competent evidence that the companies are alter egos borders on the frivolous, and maybe crosses that border.

In sum, the Court, for the foregoing reasons, denied the RNC Defendants' motion to disqualify counsel, granted the RNC Defendants' motion to dismiss the seventh cause of action as to Dugan and Tonyes, Jr., otherwise denied defendants' motions to dismiss, granted plaintiffs' motion for summary judgment dismissing most of defendants' affirmative defenses but leaving those concerning the statute of limitations and waiver and estoppel for trial, and denied defendants' motions for summary judgment.

Dated: New York, NY
March 27, 2014                               _____
                                             JED S. RAKOFF, U.S.D.J.

29